# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:18-cv-188-FDW

| | | | |
|---|---|---|---|
| JAMES C. McNEILL, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | **ORDER** | |
| | ) | | |
| MARQUHNE BENJAMIN JOHNSON, et al., | ) | | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |

**THIS MATTER** comes before the Court on Motions for Summary Judgment filed by three Defendants, (Doc. Nos. 36, 37), and on Plaintiff's Motion to Strike, (Doc. No. 44).

## I.    BACKGROUND

*Pro se* incarcerated Plaintiff's Complaint, (Doc. No. 1), passed initial review on his claim that, while he was incarcerated at the Lanesboro Correctional Institution,[1] Defendants Cedric Graham, Marquhne Johnson, Karim Lane, Susan Morrison, and Jackie Yang used excessive force and/or failed to intervene, and that Defendants Kevin White and Alfred Williams violated his due process rights with regards to a disciplinary proceeding. Defendant Johnson has not been served. (Doc. No. 22). Defendant Yang has moved for summary judgment on the claim of excessive force/failure to intervene, and Defendants White and Williams have moved for summary judgment on Plaintiff's due process claims. Defendants Graham, Johnson, Lane, and Morrison have not sought summary judgment on Plaintiff's excessive force/failure to intervene claim.

**(1)    Complaint** (Doc. No. 1)

---

[1] Plaintiff presently resides at the Polk C.I.

Plaintiff declared a medical emergency for pain on the evening of October 27, 2017, and was escorted to the Anson Unit nurse's station, while wearing a black box and waist chain, at around 2:00 AM on October 28, 2017. Nurse Leach was trying to assist Plaintiff with a prescription but was having trouble with her computer. Nurse Leach asked Defendant Yang for her help with Plaintiff's prescription order that had expired. Instead of helping Leach, Yang began shouting at Plaintiff for looking at his medical information on the computer screen, shouting "No he is not here to check on his medicine!" (Doc. No. 1 at 7). Defendants Johnson, Graham, and Morrison were inside the nurse's station with Defendant Yang, and Defendant Lane was outside the medical station door. Plaintiff responded to Yang by telling her that he came to medical for pain relief and check on the status of his pain medication and that, because all the information on the computer screen concerned him, he should have access to that information. Yang began shouting and threatening to "put [Plaintiff] out." (Doc. No. 1 at 7).

After Yang threw Plaintiff out of the medical station, Morrison grabbed Plaintiff's arm but was unable to escort Plaintiff because Graham and Johnson came towards Plaintiff and began grabbing and savagely snatching Plaintiff, jerking and shoving him out of the medical station as he was fully restrained and put up no resistance. Johnson "took charge" while the others crowded around and egged him on "like a thirsty mob fiending to see blood and guts." (Doc. No. 1 at 7). Johnson, who is six feet tall and weighs 250 pounds, threw Plaintiff into the wall, slamming his head so hard that Plaintiff almost lost consciousness. In full view of the surveillance camera, Correctional Officers Graham, Lane, and Morrison, and "Nurses" looked on as Johnson wrapped both hands around Plaintiff's throat and began savagely choking him. (Doc. No. 1 at 8). Johnson again threw Plaintiff into the wall and seemed frustrated that Plaintiff would not pass out. Johnson began punching Plaintiff's face repeatedly, again choked him with both hands, and threw him into

an empty sergeant's office. Graham, Lane, and Morrison followed him. There are a few others who video surveillance can identify as being "excited conspiratorial spectators." (Doc. No. 1 at 8).

Once inside the sergeant's office, Johnson began assaulting Plaintiff with Graham, Lane, and Morrison egging him on. Johnson choked Plaintiff on top of the sergeant's desk, slammed him to the floor and choked him with both hands, then began punching his face and head. No prison staff member tried to intervene even though Plaintiff was helpless to defend himself. Plaintiff never spit on anyone or attempted to like "defendant" falsely alleged. (Doc. No. 1 at 9). Plaintiff did not possess a weapon, attempt to reach into his pants, or try to spit.

The assault stopped when Sergeant Griffin came into the office and picked Plaintiff up off the ground. Plaintiff told them to take him to medical. Instead, they took him back to the Anson Unit medical station to Nurse Yang. Plaintiff was woozy and had "partial memory loss temporarily" and cannot tell who was present besides Griffin, Morrison, and Lieutenant White. (Doc. No. 1 at 9). Plaintiff's eye was already swelling and he had a cut on his face. He was dizzy and had severe back pain. Yang had a "conflict of interest" so she did not treat Plaintiff professionally. (Doc. No. 1 at 10). She gave him an ice pack for his eye. Griffin and Morrison escorted Plaintiff back to his cell. His neck was swollen and he was still wheezing somewhat.

Plaintiff wrote a statement an hour later while he was still dizzy and "fighting head trauma." (Doc. No. 1 at 10). He was told the statement was for an incident report and Plaintiff' requested that video be reviewed for the blatant assault. Plaintiff requested that Herring view the video so that he could terminate the employment of all the staff who participated. However, he failed to take corrective action. Instead, he immediately promoted Johnson to lieutenant and "helped to cover up" the assault. (Doc. No. 1 at 10).

Lieutenant White, the investigating officer, never read Johnson's statement so Plaintiff

never knew he was alleging that Plaintiff was attempting to reach into his pants for a homemade knife or was acting like he was going to spit on him. White and Johnson came to Plaintiff's cell the night after the incident and only had a disciplinary rights form. He did not give Plaintiff an opportunity to write a statement or have witness statements. White said he was going to use Plaintiff's incident report statement from immediately after the incident. White did not read Graham, Morrison, Johnson, Cane, Yang, or Leach's statements to Plaintiff. White did say, however, that he viewed the video and that the excessive force was blatant, and Johnson could be seen viciously choking and punching Plaintiff's face while Plaintiff was handcuffed, chained, and acting non-aggressive. However, White still lied and helped cover up the malicious assault by recommending that Plaintiff receive bogus charges. Anson Unit Manager William Horne collaborated as charging officer on the bogus charges, by serving them on Plaintiff on November 3, 2017. The videotape footage exposes these lies and shows that the assault was unjustified. White, Horne, and Williams collaborated to cover up Johnson's actions and save his job while framing Plaintiff on bogus charges.

On November 8, 2017, Plaintiff pled not guilty at the disciplinary hearing before Disciplinary Hearing Officer ("DHO") Alfred Williams. Williams never read any statements or evidence and said that he was sending the disciplinary package back for video footage and dismissed Plaintiff without having a hearing on the charges. An hour later, a correctional officer brought Plaintiff an Offense and Disciplinary Report and Record of Hearing saying that Williams found him guilty and imposed solitary confinement and loss of privileges which extended his long-term punitive segregation. Williams states in the record that Correctional Officer Bookless wrote a statement that she witnessed Plaintiff being combative with medical staff and threatened to assault Johnson with a homemade knife. Plaintiff also never requested a statement from Nurse

Cherie, who does not work at Lanesboro, and Bookless was not working the night of the incident and therefore could not have made a witness statement. There was no hearing on the charges from Johnson so it is impossible for Plaintiff to have stated what is contained in the Record of Hearing.

Plaintiff suffers daily pain and trauma from the assault both mentally and physically. His back pain and neck pain have become worse and he takes narcotic pain medication. He has blinding headaches, periods of blurred vision, nerve pain in his arms and thighs, and extreme lower back pain. His mental trauma includes nervousness, fear, anxiety, depression, and hopelessness.

Plaintiff seeks compensatory and punitive damages, and a change in prison policy such that any staff who fail to intervene when assault of a restrained inmate is occurring are immediately fired.

**(2)**     <u>**Motions for Summary Judgment**</u>

**(A)**     <u>**Defendant Yang**</u> (Doc. No. 36)

Defendant Yang argues that she did not violate Plaintiff's Eighth Amendment rights because she is a public employee, not a law enforcement officer, and therefore is not subject to the standard of bystander liability and had no duty to intervene. Further, she did not act under the color of state law pursuant to § 1983 because the alleged assault is not related to the exercise of her medical duties as a nurse. Finally, Plaintiff failed to establish Yang's personal involvement in the incident. Yang has attested to the fact that she was not aware of any assault on Plaintiff, so she cannot be held responsible for actively participating in the assault or for failing to intervene.

**(B)**     <u>**Plaintiff's Response**</u> (Doc. Nos. 43, 48)

Plaintiff was informed of the legal standard applicable to motions for summary judgment and of the importance of responding to Defendant Yang's Motion. <u>See</u> (Doc. No. 39).

Plaintiff filed a Response in which he asks the Court to stay Yang's Motion until discovery

issues are resolved.[2] (Doc. No. 43).

Plaintiff filed a second Response, (Doc. No. 48), arguing that Defendant Yang was deliberately indifferent to a serious medical need because he had obvious injuries when he was brought to the Anson medical station after the use of force, and all she did was to give him an ice pack for his swollen eye.

**(C)** **Defendant Yang's Reply** (Doc. No. 45)

Defendant Yang argues that Plaintiff's request for a stay be denied because video footage of the alleged use of force will have no impact on the Court's determination of Yang's liability under § 1983. Any video footage depicting Yang's alleged failure to act is irrelevant because Yang is not a law officer and therefore is not subject to bystander liability and any failure to act is not related to Yang's medical duties as a nurse and thus would not constitute state action or action under the color of state law. Plaintiff is not suing Yang for her alleged role in the assault or for medical treatment. Consequently, video footage of Yang's alleged failure to act has no impact on whether she may be held liable under § 1983.

**(D)** **Defendants White and Williams** (Doc. No. 37)

Defendants White and Williams argue that Plaintiff cannot show he was entitled to due process before being disciplined so nothing about the investigation and discipline for the October 28 incident so they could not have violated Plaintiff's due process rights. Plaintiff's liberty interests were not implicated by Defendants' alleged conduct so he has no due process rights with regards to the disciplinary hearing at issue. Plaintiff's liberty interests have not been impacted. He lost 30 days good time credits, 20 days of Restrictive Housing for Disciplinary Purposes ("RHDP"), 70

---

[2] Plaintiff filed a Motion to Compel Discovery, (Doc. No. 40), that was pending at the time he filed his Response to Defendant Yang's Motion for Summary Judgment. (Doc. No. 40).

hours of extra duty, loss of canteen and phone privileges for 90 days, and three months limited withdrawals from inmate trust fund account. Plaintiff is sentenced to life with no possibility of parole or early release. North Carolina sentence reduction credits do not shorten a life sentence but merely apply to custody status, parole eligibility and potential commutation, so lost good time has no impact on Plaintiff's sentence. Loss of privileges and the assignment of extra duty in prison do not implicate an inmate's liberty interests. There is no basis to conclude that 70 hours of extra duty, loss of canteen and phone for 90 days, or suspension of withdrawals from his trust account are atypical and significant. Further, temporary reassignment to RHDP does not implicate liberty interest because it is not significant and atypical compared to his conditions of confinement upon incarceration because it is not significantly more onerous than close custody general pop which is Plaintiff's regular assignment. The RHDP was also a very short 20-day period and did not have any collateral consequences to his life sentence

Even if a liberty interest existed, Defendants did not violate Plaintiff's due process rights. Plaintiff alleges that Defendant White failed to inform him of the allegations, read him the officer's witness statement or give him an opportunity to write a statement. However, due process does not require these procedures be provided and/or other department employees (not White) are responsible for providing this process. While due process requires advance written notice of charges, Defendant White was never tasked with providing that notice. Horne provided advance written notice of the charges on November 3, five days before the November 8 disciplinary hearing. Defendants are not aware of any case in the prison context saying that due process requires that witness statements be read to the inmate by an investigating officer or that an investigator take a statement from the accused. Even if this was required, the DHO is tasked with providing those procedures at the disciplinary hearing, not White.

Defendant Williams argues that he did not act intentionally so did not violate Plaintiff's rights. Due process is not implicated by a negligent act of an official that caused unintended loss to life, liberty, property. There is no evidence that Defendant Williams intentionally denied Plaintiff of any procedural processes. The evidence shows that Williams intended to ensure that Plaintiff received a full disciplinary hearing, including viewing the requested video evidence. He unintentionally sent back the wrong incident for reinvestigation and therefore did not view the video before finding Plaintiff guilty. This was understandable confusion because Williams oversaw two hearings involving Plaintiff on identical charges for two separate incidents in the same month on similar dates (October 18 and 28). Williams did not intentionally deprive Plaintiff of due process so he cannot be liable under § 1983.

Defendants argue that they are entitled to sovereign immunity on the claims against them in their official capacities and that there is no evidence to support punitive damages.

**(E)** <u>**Plaintiff's Response**</u> (Doc. No. 44)

Plaintiff was informed of the legal standard applicable to motions for summary judgment and of the importance of responding to Defendants White and Williams' Motion. <u>See</u> (Doc. No. 42).

Plaintiff filed a Motion to Strike Defendants White and Williams' Motion for Summary Judgment in which he states that he requested some of their summary judgment exhibits in discovery but never received them, refers to his Motion to Compel Discovery, and asks that these Defendants' Motion for Summary Judgment be stricken. Plaintiff argues that investigations were conducted on February 7, 2019, March 6, 2019, and May 22, 2019 by Sergeant Regina McInnis, Lieutenant Crystal Atkinson and Captains David Aaron and Miranda Mimms. The investigators concluded that, based on the video footage, the use of force by Defendant Johnson was physical

brutality and that Plaintiff did not pose a physical threat at any time. Plaintiff appears to argue that Defendant Williams refused to view the videotape and that the "deliberate acts" of Defendants White and Williams contributed to his placement on Restrictive Housing for Control Purposes ("RHCP") for 180 days, which is "long term punitive segregation" that can become permanent. (Doc. No. 44 at 1). Plaintiff asks that the Motion for Summary Judgment filed by Defendants White and Williams be stricken and that judgment be granted in Plaintiff's favor.

### (F) Defendants White and Williams' Reply (Doc. No. 53)

Defendants White and Williams note that Plaintiff clarified in his Response that his due process claims are based on his placement in RHCP, not RHDP. Summary judgment in Defendants' favor is still warranted after taking into account this clarification because Plaintiff's placement in RHCP did not affect his liberty interests, and thus, no constitutional due process rights apply. RHCP does come with certain restrictions, but RHCP restrictions are not atypical and substantial compared with Plaintiff's typical conditions of confinement in close custody. Plaintiff cannot establish that he was entitled to due process before being placed in RHCP because the discipline imposed did not affect his liberty interests. Further, the Department followed its procedures when placing Plaintiff into RHCP, which was done due to Plaintiff's assault on another inmate on September 14, 2017, and his October 28, 2017 charges for threatening to harm staff and for profane language. Plaintiff's referral to RHCP on January 8, 2018 was for the protection of staff and other inmates. Even if the Defendants' involvement in the investigation and discipline of the October 28 incident was partially responsible for his placement into RHCP, this placement did not impact a liberty interest and therefore cannot support a finding of a Fourteenth Amendment violation.

### (G) Plaintiff's Surreply (Doc. No. 57)

Plaintiff states in his verified Surreply that he was treated as RHCP as soon as he was served paperwork on November 9, 2017. A referral for placement on RHCP resulted from the October 28, 2017 incident's disciplinary investigation by Defendants White and Williams. The RHCP solitary confinement and segregation restrictions were not lifted until May 23, 2018 when Plaintiff was transferred. The September 14, 2017 assault on another inmate was actually self-defense where Plaintiff was attacked by two inmates with knives. Plaintiff was hospitalized with a life-threatening stab wound to the neck. RHCP and close custody in the general population are not the same. RHCP does not have a telephone, television, or food and hygiene privileges from canteen, which close custody general population does allow. Close custody general population inmates are outside their cells with yard and dayroom privileges, they can attend religious services, chow hall, gym, have contact visitations, and order food packages. RHCP inmates do not have access to any of the foregoing and are confined on a Segregated Housing Unit ("SHU") on solitary confinement. RHCP is the equivalent of supermax punitive segregation or "H-Con" and it is misleading for Defendants to compare RHCP to close custody general population status. (Doc. No. 57 at 2).

**(3)** **Evidence**[3]

    **(A)** **Affidavit of Jackie Yang, R.N.** (Doc. No. 36-1)

Defendant Yang is a Registered Nurse who was licensed in North Carolina at the relevant time. From September 25, 2017 to December 22, 2018, Yang worked as an independent contractor for a healthcare staffing service, Cell Staff LLC at Lanesboro C.I. Yang does not have copies or access to any Lanesboro nursing rosters. During the time in question, Yang was not employed by,

---

[3] This section is not exhaustive. The Court takes judicial notice of the applicable NCDPS Policy & Procedure and Lanesboro SOPs. See Fed. R. Ev. 201.

and did not work as an independent contractor for, Lanesboro C.I., the State of North Carolina, NCDPS, or any other agency of the State of North Carolina. Yang does not have copies of, or access to, any policies, procedures manuals, or employment documents belonging to any state agency. She was not a law enforcement officer or prison official and has not had relevant training as a law officer or prison official. During the times in question, she did not act as a law officer or prison official at Lanesboro.

On or about October 27 or 28, 2017, Yang was working in the nursing unit at Lanesboro when two correctional officers brought Plaintiff to the nursing unit. Another nurse was talking to Plaintiff when Plaintiff started yelling and cursing at Yang. Plaintiff then started moving towards the nursing computers, which is not allowed. Yang asked the correctional officers to escort Plaintiff out of the nursing unit, which they did. Yang did not ever shout back at Plaintiff or threaten to put him out. Later on, after the correctional officers brought Plaintiff back into the nursing unit, Yang gave Plaintiff an ice pack and Tylenol while he continued to curse at her.

Yang never saw or heard of any correctional officer assaulting Plaintiff, including choking, throwing, or punching him. Yang does not have knowledge of any surveillance tape, records, or written statements relating to an assault on Plaintiff by correctional officers. Yang did not act wrongfully towards Plaintiff or witness anyone else treating Plaintiff wrongfully.

**(B)**     **Declaration of Edward Gazoo** (Doc. No. 38-2)

Gazoo is Program Director at Lanesboro. As such, his duties include the classification of inmates into the appropriate custody level. Gazoo has access to, and reviewed, Plaintiff's record of custody. Gazoo also has "knowledge of the conditions associated with each of the Department's custody classifications at Lanesboro…." (Doc. No. 38-2 at 1).

Plaintiff was convicted of murder and sentenced to life in 2014. He was classified into

close custody in the general population upon admission to the Department. Plaintiff has never been reclassified to a lower custody level since his admission into the Department in 2014.

The Lanesboro Standard Operating Procedures ("SOP") governing general custody at Lanesboro, provide that inmates in Close Custody at Lanesboro:

a. Are assigned to a Unit, POD and cell, and are only authorized to be in their assigned areas;

b. Are provided with sanitary cells that they are required to keep sanitary;

c. Have a sink and toilet in their cells;

d. Are required to be in their cells each night from 11:00 PM or 12:00 AM to no longer than 8:00 AM depending on the unit;

e. Are required to be in their cells for counts and lockdowns;

f. Are generally allowed to shower daily;

g. Take their meals in the dining hall;

h. Are provided opportunities to use the gym, dayroom, canteen, and outdoor recreation yard;

i. Have opportunities for work or program assignments;

j. Are allowed to have radios;

k. Have access to necessary medical care;

l. Are allowed to have limited personal possessions.

(Doc. No. 38-2 at 2-3).

The Department's policies and procedures respecting RHDP inmates are that they:

a. Stay in cells that are maintained in sanitary conditions;

b. Have a sink and toilet in their cells;

c. Have the opportunity to shave twice a week and shower at least three times per week;

d. Have access to necessary medical care;

e. Are allowed one hour per day, five days per week to exercise outside the cell;

f. Have the same mail privileges as offenders in the general population;

g. Are allowed to receive visitors, limited to one hour per visit in the non-contact visitor area;

h. Are allowed to access up to $10 per week from their trust fund account;

i. May have personal property including authorized religious materials, books, and magazines not exceeding two cubic feet;

j. Receive their meals in their cells;

k. Have access to cell study, portable library, and pastoral care;

l. Receive daily visits from the officer in charge, daily visits from a qualified health care staff member (unless medical attention is needed more frequently), and visits from program staff upon request by staff or other offenders;

m. Are not permitted canteen orders except for stamps, over the counter medications, and essential hygiene items; and

n. Are not permitted to use a radio and earplugs/earphones.

(Doc. No. 38-2 at 3-4).

**(C)** **Declaration of Kevin White** (Doc. No. 38-6)

Defendant White was a Correction Lieutenant at Lanesboro at the relevant times. Inmates in the Department are required to follow the Department's rules and regulations. Inmates are subject to disciplinary action if they have violated the Department's rules and regulations.

Under the Department's disciplinary policy, an Investigating Officer is assigned to

investigate allegations of inmate misconduct. The Investigating Officer is required to complete the investigation and submit the results, including a recommendation for whether the inmate should be charged with a disciplinary offense. After an investigating officer makes a recommendation, their role in the disciplinary process is over.

Following the Investigating Officer's recommendation, another officer will review the investigation and decide whether to charge the inmate. If the inmate is charged, the charging officer is responsible for providing 24-hour written notice of the specific charges to the inmate or for obtaining a waiver of the notice.

On October 28, 2017, White was assigned as the Investigating Officer for the report that Plaintiff violated Department rules and regulations by threatening to assault and spit on staff and my making movements to do so. During the investigation, White provided Plaintiff with a DC-138A form that explained his rights. White also collected a written statement from Plaintiff, which Plaintiff wrote immediately after the incident, before White had been assigned as Investigating Officer. White gave Plaintiff the opportunity to write an additional statement but Plaintiff said that he wanted to use his prior statement for the disciplinary investigation. In his written statement, Plaintiff had the opportunity to request that statements from other witnesses be gathered, that live witnesses be present at the hearing, and that physical evidence be reviewed at the hearing. Plaintiff only asked that video footage of the incident be reviewed at the hearing. White reviewed statements from approximately seven employees who were involved in the incident, that were written immediately after the incident.

Based on his investigation, White recommended that Plaintiff be charged with a B18 offense for threatening to stab and spit on staff and a C02 offense for calling a nurse names.

Following the recommendation, Unit Manager William Horne reviewed White's Report

14

and made the decision to charge Plaintiff with the B18 and C02 offenses. Unit Manager Horne was responsible for providing Plaintiff with 24-hour written notice of these charges.

**(D)** **Declaration of Alfred Williams** (Doc. No. 38-9)

Defendant Williams was the DHO assigned to hear a B18 and C02 disciplinary charge against Plaintiff based on alleged conduct occurring on October 18, 2017. Williams was also the DHO assigned to hear a B18 and C02 disciplinary charge against Plaintiff based on alleged conduct occurring on October 28, 2017. Hearings on the October 18 and 28 incidents were scheduled the same day, November 8, 2017.

For the October 28 incident, Williams noted that Plaintiff had requested review of video evidence but Williams did not have that evidence. Williams therefore sent those charges back for reinvestigation to obtain the video evidence. However, Williams confused the October 18 and 28 incidents. As a result of his confusion, he unintentionally sent back for reinvestigation of the charges for the October 18 incident instead of the October 28 incident. Williams' confusion also resulted in finding Plaintiff guilty of the October 28 incident and charges without reviewing the requested video.

Reinvestigation of the October 18 incident found that video evidence had never been requested. On November 13, 2017, Williams conducted another hearing on the October 18 incident and found Plaintiff guilty. Williams only discovered the mistake and confusion between the October 18 and 28 charges and hearing when responding to this lawsuit.

Williams never intended to discipline Plaintiff for the October 28, 2017 incident without first reviewing the video evidence that he requested.

## II.    LEGAL STANDARDS

**(1)** **Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

As a general rule, when one party files a motion for summary judgment, the non-movant

cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. <u>Celotex</u>, 477 U.S. at 324; <u>Kipps v. Ewell</u>, 538 F.2d 564, 566 (4th Cir. 1976); Fed. R. Civ. P. 56(e). However, a verified complaint, like the Amended Complaint that Plaintiff filed, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991); <u>Davis v. Zahradnick</u>, 600 F.2d 458, 459–60 (4th Cir. 1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment).

**(2)  <u>Due Process</u>**

The Fourteenth Amendment's Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. The first inquiry in any due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty that was accomplished by state action. <u>Tigrett v. The Rector and Visitors of the Univ. of Va.</u>, 290 F.3d 620, 628 (4th Cir. 2002); <u>Stone v. Univ. of Md. Med. Sys. Corp.</u>, 855 F.2d 167, 172 (4th Cir. 1988). "Unless there has been a 'deprivation' by 'state action,' the question of what process is required and whether any provided could be adequate in the particular factual context is irrelevant, for the constitutional right to 'due process' is simply not implicated." <u>Stone</u>, 855 F.2d at 172. Moreover, "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986). A plaintiff does not have a federally protected liberty interest in any particular housing or classification unless it exceeds the scope of his original sentence and imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. <u>See</u> <u>Sandin v. Conner</u>, 515 U.S. 472 (1995); <u>Gaston v. Taylor</u>, 946 F.2d 340, 343 (4th

17

Cir. 1991) (*en banc*) ("[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges … are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and efficiently.").

**(3)    Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

### III.    DISCUSSION

**(1)    Defendant Yang**

Plaintiff alleges in his unverified Complaint that Defendant Yang failed to intervene in an attack he suffered at the hands of Defendants Graham, Lane, and Morrison.

Defendant Yang has presented evidence that she was a public employee, not a law

enforcement officer, who had no duty to intervene, and that she did not act under the color of state law pursuant to § 1983 because the alleged assault is not related to the exercise of her medical duties as a nurse, and that Plaintiff failed to establish Yang's personal involvement in the incident.

In response, Plaintiff sought a stay pending resolution of discovery issues and argues that Yang was deliberately indifferent to a serious medical need.

Plaintiff's attempt to revive a deliberate indifference claim against Yang, which was dismissed on initial review, will be rejected. Plaintiff's Motion to Compel has now been denied and there is no justification for staying the case. Plaintiff has failed to refute Yang's evidence that she was not a law enforcement officer, had no duty to intervene, did not act under the color of state law, and had no personal involvement in the excessive force incident. Plaintiff has not demonstrated the existence of a genuine dispute of material fact with regards to Defendant Yang's alleged failure to intervene, and therefore, Defendant Yang's Motion for Summary Judgment will be granted.

**(2)    <u>Defendant White</u>**

Plaintiff appears to allege in his unverified Complaint that White only gave him a disciplinary rights form the night after the incident, that White did not give Plaintiff the opportunity to write a statement or have witness statements and said that he was going to rely on the statement that Plaintiff wrote immediately after the incident, that White did not read Graham Morrison, Johnson, Cane, Yang, or Leach's statements to Plaintiff, and White recommended that Plaintiff receive charges even though he admitted that the video showed blatant excessive force.

Defendant White presented evidence that he provided the procedure required by policy and Defendant White was not tasked with providing Plaintiff with 24-hour written notice. Defendant White is not aware of any cases in the prison context saying that due process requires that witness

statements be read to the inmate by an investigating officer or that an investigator take a statement from the accused and, even if this was required, it would be the responsibility of the DHO rather than White. Defendant White further submitted evidence that he provided Plaintiff with the opportunity to submit a statement in addition to the original statement he completed immediately after the incident and to call witnesses, but Plaintiff chose to rely on his original statement and the only evidence he requested was video surveillance footage. This includes the Statement by Witness that Plaintiff completed at 23:20 on October 28, 2017 that sets forth requests, including that written statements be gathered on his behalf, that live witnesses be present at the hearing, and for staff assistance at the hearing. The only requested checked by Plaintiff is that the surveillance footage be reviewed at his hearing. (Doc. No. 38-8 at 13).

Plaintiff has failed to rebut the evidence presented by Defendant White. Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact with regards to Defendant White's alleged due process violation. Therefore, Defendant White will be granted summary judgment.

**(3)    <u>Defendant Williams</u>**

Plaintiff alleges in his unverified Complaint that Defendant Williams said he was sending the disciplinary package back to get video of the incident and then dismissed him without hearing the charges. However, an hour later, a correctional officer brought Plaintiff an Offense and Disciplinary Report and Record of Hearing in which Williams found him guilty and imposed solitary confinement without reading any statements or evidence, and referred to Nurse Cherie, who was not working at the time of the October 28 incident.

Defendant Williams has submitted evidence about the conditions for close custody general population and RHCP custody and argues that no due process was required because his brief stay

in RHCP did not impose an atypical or significant hardship on Plaintiff. Williams further presented evidence admitting that he mistakenly failed to view the videotape for the October 28 incident due to a mix-up with identical charges on a similar date, October 18. Williams has presented evidence that he never intended to discipline Plaintiff for the October 28, 2017 incident without first reviewing the video evidence that Plaintiff requested, and that any due process violation was due to an error by him and was not intentional.

Plaintiff has filed a sworn Response in which he states that the solitary confinement restrictions lasted 194 days, that RHCP and close custody general population are not the same, and that RHCP is more analogous to supermax punitive segregation.

Although the parties dispute whether RHCP presents a significant and atypical hardship such that due process is required, the Court need not resolve that issue. Defendant Williams has come forward with evidence admitting that he made an error in the disciplinary proceeding but that the error was unintentional and due to the existence of identical charges on a similar date that was also being heard that day. Plaintiff has failed to rebut Defendant Williams' assertion that, if any due process violation occurred, it was unintentional. See Daniels, 474 U.S. at 328 ("the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."). Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that Defendant Williams purposefully deprived him of due process rights. Therefore, Defendant Williams' Motion for Summary Judgment will be granted.

**(4)**      <u>**Official Capacity Claims**</u>

Defendants White and Williams further argue that they should be granted summary judgment on the claims against them in their official capacities for damages because they are barred by sovereign immunity. See Almone, 478 F.3d at 106; Hutto, 773 F.3d at 549. Defendants

White and Williams' Motion for Summary Judgment for damages is granted on that basis.

IV.    CONCLUSION

Based on the foregoing, Defendants Yang, White, and Williams' Motions for Summary Judgment are granted and Plaintiff's Motion to Strike is denied. This case will be set for trial on the remaining claims of excessive force and failure to intervene in a separate order.

**IT IS, THEREFORE, ORDERED** that:

1.  Defendant Yang's Motion for Summary Judgment, (Doc. No. 36), is **GRANTED**.

2.  Defendants White and Williams' Motion for Summary Judgment, (Doc. No. 37), is **GRANTED**.

3.   Plaintiff's Motion to Strike, (Doc. No. 44), is **DENIED**.

4.  The Clerk is respectfully instructed to use reasonable efforts to locate a volunteer lawyer to assist Plaintiff at trial pursuant to 3:19-mc-13.

Signed: February 3, 2020

Frank D. Whitney
Chief United States District Judge